UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DEAN BOHN,

        Plaintiff,

                                  Case No. 11-10618
v.                                    Honorable Thomas L. Ludington

HERALD PUBLISHING CO.,

        Defendant.
_____ /

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

When Defendant Herald Publishing Co. hired Plaintiff Dean Bohn as a reporter, Defendant pledged that it would not terminate Plaintiff's employment as long as he performed "satisfactorily." Ten years later, Defendant terminated the relationship. Plaintiff brought suit. The single-count complaint claims the discharge was wrongful as Plaintiff had been performing satisfactorily. Defendant now moves for summary judgment. ECF No. 17. As the undisputed evidence establishes that Defendant was genuinely dissatisfied with Plaintiff's performance, the Court will grant Defendant's motion.

**I**

The parties' relationship began in 2000, when Defendant hired Plaintiff as a reporter for the *Saginaw News*. When hired, Plaintiff received an employee handbook that contained a "job security pledge" providing:

> We provide job security to all full-time, salaried employees who are not covered by a collective bargaining agreement. This means that no full-time, salaried employee will lose his or her job because of new equipment, technological advances or lack of work. Once you have satisfactorily completed a probationary period, you will become a permanent employee. Then, this unique job security pledge applies to you as long as you continue to perform your assigned tasks

satisfactorily, do not engage in misconduct and this newspaper continues to publish.

Def.'s Mot. Summ. J. Ex. B, at 5 ("Def.'s Mot."). Plaintiff was hired as a full-time, salaried employee who was not covered by a collective bargaining agreement. Thus, after he completed a probationary period he was eligible for coverage under the job security pledge. Plaintiff completed the probationary period.

In 2001, Jodi McFarland became Plaintiff's supervisor. Several years passed, during which Ms. McFarland documented no dissatisfaction with Plaintiff's performance. This changed on April 20, 2006, when Ms. McFarland emailed the editor of the *Saginaw News*, Paul Chaffee, and its head metro editor. She wrote:

> I met with Dean Bohn on Thursday, April 13, the soonest our shifts overlapped after publication of the story "Lost rudders jeopardize Saginaw River traffic" (A1 Wednesday, April 12.)
>
> Point by point and paragraph by paragraph, we examined the story as he submitted it and as it ran.
>
> We started at the top: The original lede could have run atop a story a week ago; he had buried the new development. Dean said he tries to write second-day ledes. We agreed that in this case, he failed.
>
> I addressed sloppiness in subject/verb agreement and redundancy of information in a handful of spots in the 36-inch original. He acknowledged the errors.
>
> Next up: flat-out inaccuracy. . . . His defense was that he had shortened the story, knowing it was overly long, and his cuts should have been more careful, and that he had worked a full day and wasn't at his sharpest.
>
> My instruction: When you write a story, you have to walk away from it, come back and try to read it from a fresh point of view. . . . He replied that he was already on overtime. Not acceptable, I told him. You walk away for five minutes, come back and read it again, closely. It is not OK to turn in a thrown-together, 3-foot-long story that must be completely rewritten by an editor on a deadline. . . .

> Our talk was productive, in that he agreed he can do better and should do so. He seemed to appreciate the coaching.

Def.'s Mot. Ex. I (emphasis omitted).

Reflecting on her dissatisfaction with Plaintiff's performance, Ms. McFarland testifies "Mr. Bohn was not a good writer and failed to adhere to deadlines which are poor traits for a newspaper reporter. . . . . Over the next year and a half (during which I supervised him) Mr. Bohn's performance did not improve." McFarland Aff. 2, *attached as* Def.'s Mot. Ex. H.

In July 2007, Ms. McFarland again emailed Mr. Chaffee regarding her dissatisfaction with Plaintiff's performance. She wrote:

> I started a closed-door session with Dean Bohn today, July 16, 2007, by stating first off that I am unhappy with his level of productivity and don't feel that he has pulled his weight, last week in particular. . . .
>
> I am angry that he wrote only one bylined story, sundry briefs and a Back 40 rail. My greatest anger, however, is directed at a dropped assignment he received Tuesday about County Prosecutor Michael D. Thomas [being] upset with the governor's plans to revise sentencing guidelines. . . .
>
> I outlined my expectations as follows:
>
>   1. Communication. I need to know the progress he's made or failed to make on each of his assignments,
>
>   2. Work ethic. He needs to earn his keep. He needs to write things that run in our paper every day, and more of them.
>
> Dean responded that [Mr.] Thomas responded to him in e-mail form mid-week but other things kept him from putting a story together. That's not OK, I told him. We were stomped statewide today on a story that should have been ours a week ago, and we have only ourselves to blame. . . .
>
> I said I want a measurable improvement from last week to this week. Time spent cleaning his desk and finishing a Focus story that was due a month earlier are unacceptable, and he has only himself to blame for being in a jam with those tasks.
>
> I recapped our session by telling him I want to be clear: Step it up.

Def.'s Mot. Ex. J, at 1–2, 4.

In November 2008, Defendant offered a number of its reporters, including Plaintiff, a buyout agreement. Explaining that "the economic conditions in the nation, the State and, particularly, the newspaper industry continue to deteriorate," Defendant offered "[t]wo weeks of severance for every completed full-time year of service with a minimum of twenty-six weeks severance." Def.'s Mot. Ex. F. Plaintiff declined the buyout offer. This refusal, he alleges, placed a "target on his back."

In June 2009, Plaintiff was transferred to the *Flint Journal*, another of Defendant's papers. The acting community editor, John Foren, became Plaintiff's supervisor. In July 2009, Mr. Foren wrote to Marjorie Raymer (an editor out on maternity leave) and John Hiner, the Editor of the *Flint Journal*:

> I would recommend monitoring the performance of Dean Bohn, who moved to *The Journal* on June 1.
>
> Dean's attitude has been agreeable enough. However, I've found his performance lacking in both quality and quantity. I've given Marjorie a couple updates on him and suggested that she pay special attention in monitoring him. Here's what I've found:
>
> — His production trails far behind other reporters. He simply does not enterprise well, which is a key for anyone in our newsroom. That means he just doesn't generate ideas very well. He stays in the office a lot, doesn't know the area well and doesn't seem that interested in getting to know it. . . .
>
> — The quality of his writing and reporting is really lacking. I'd put it on a par with a small-town daily or weekly newspaper reporter (maybe). The writing is not up to our standards . . . .
>
> — I don't sense a strong commitment to the newspaper or company. In one case, as we were talking about the need to get a source for a big story, he said, "It makes no difference to me. I get paid every Thursday regardless." Not the attitude we need in anyone here.

> Overall, I just don't think he meets the high standards we need in this intense new world in which we are placing much more responsibility on reporters.

Def.'s Mot. Ex. K (italics supplied).

Ms. Raymer returned from maternity leave in July 2009 and became Plaintiff's supervisor. The following month, she wrote to Mr. Hiner expressing similar dissatisfaction with Plaintiff's performance. She wrote:

> I wanted to make you aware of several issues relating to Dean Bohn that came up last week. First, I spoke with him Monday (Aug. 3) to outline several problems with his production from the previous week (July 27–31):
>
> - The vast majority of his stories were one-source stories. Only [one] article (on police cuts) included two sources. I told him three is standard for most stories . . . .
>
> - A major problem with his reporting also is a complete lack of real people. Not one story turned in that week included quotes from residents about the issue. . . .
>
> This week did not see significant improvement and additional problems came up.

Def.'s Mot. Ex. M.

Reflecting on Plaintiff's performance, Ms. Raymer testifies "I was dissatisfied with Mr. Bohn's work product, his failure to follow instructions, and his lack of dedication to his job. . . . On September 9, 2009, I wrote Mr. Hiner to inform him that I had several major problems with Mr. Bohn in the prior week. . . . I also wrote Mr. Hiner on November 3, 2009, to inform him of my dissatisfaction with Mr. Bohn's performance of his assigned tasks." Raymer Aff. ¶¶ 4, 7–8, *attached as* Def.'s Mot. Ex. P.

She continues by enumerating specific deficiencies in Plaintiff's performance, including: "(1) not writing enough stories; (2) not writing quality stories; (3) not being dependable; (4)

inability to do an adequate job reporting stories the first time; and (5) he showed no signs of improvement. . . . Ultimately, in December 2009, I recommended to Mr. Hiner and Matt Sharp (the *Flint Journal*'s publisher) that the *Flint Journal* should terminate Mr. Bohn because he was not satisfactorily performing his job duties." *Id*. ¶¶ 8, 11 (italics supplied).

In Plaintiff's deposition, he confirms that Ms. Raymer was dissatisfied. Discussing an election-night issue, counsel asked Plaintiff:

> Q: [Ms. Raymer] goes on to write, "Dean is not writing quality stories and is not dependable. On election night, Dean was the only reporter who did not properly follow directions to create shell stories for quick postings as results came in. He also did not call in updates with candidate comments as requested. It was the only race he had to cover, but we had no updates for two hours." Was that accurate?
> A: That sounds accurate. That sounds accurate. That's the time of the — the laptop wouldn't send messages, wouldn't post.
> Q: Did you call in?
> A: Yes.
> Q: What time did you call in?
> A: Don't know.
> Q: It says, "Dean did not call in updates."
> A: I called in for direction on how to use the laptop.
> Q: Oh, okay. You didn't call in updates on the story?
> A: I would have wrote the updates if I could get the laptop to work.
> Q: You couldn't get the laptop to work so you chose to call — to get the laptop to work as opposed to calling the story, right? Am I correct?
> A: Would you repeat that please?
> Q: You couldn't get the laptop to work?
> A: The connection to the internet to work the laptop I believe was working.
> Q: So you couldn't get the connection to work, so what you did is you called in to try to get the connection to work as opposed to calling in the story?
> A: I eventually did call in the story.
> Q: At 10:27?
> A: I don't know the time.
> Q: You understood Ms. Raymer was not happy about that?
> A: She was never happy with me.

Pl.'s Dep. 189:9–190:17. Likewise, Plaintiff confirms that Mr. Sharp expressed concerns to Plaintiff regarding his performance. Counsel asked Plaintiff:

> Q: Mr. Sharp told you that you weren't performing and you needed to improve, correct?
> A: I don't remember . . . .
> Q: But you understood based on your discussions with [Mr. Sharp] and Mr. Foren and with Ms. Raymer from June through November that you needed — that there were things that they believed you needed to improve on, correct?
> A: They kept telling me that, yes.
> Q: And told you what you needed to improve on, correct?
> A: They told me lots of things, yes.

Pl.'s Dep. 194:10–12, 194:18–24. As noted, in December 2009, Ms. Raymer "recommended to Mr. Hiner and Matt Sharp (the *Flint Journal*'s publisher) that the *Flint Journal* should terminate Mr. Bohn because he was not satisfactorily performing his job duties." Raymer Aff. ¶ 11 (italics supplied). Mr. Sharp agreed. On January 4, 2010, he terminated Plaintiff's employment. This litigation followed.

In December 2010, Plaintiff filed a single-count complaint in the Saginaw Circuit Court alleging wrongful discharge. In pertinent part, the complaint notes that Plaintiff's employment "was terminable only if the Plaintiff did not satisfactorily perform his job or engage in misconduct." Compl. ¶ 23. It continues: "Plaintiff satisfactorily performed all aspects of his job prior to Defendant's breach of the agreement when it transferred the Plaintiff to the *Flint Journal*. Plaintiff continued to perform his job after the Defendant breached its prior agreement, and transferred the Plaintiff to the *Flint Journal*. . . . Plaintiff completed his probationary period and did not do anything that would justify termination under the guidelines." *Id*. ¶¶ 25–26, 28 (italics supplied).

Defendant removed the case to this Court based on diversity of citizenship. Moving for summary judgment, Defendant asserts that the termination was not wrongful because Defendant was genuinely dissatisfied with Plaintiff's performance.

Plaintiff responds that Defendant is not entitled to summary judgment for two reasons. First, whether Defendant was dissatisfied with Plaintiff's performance is a question of fact. And second, Plaintiff's transfer to the *Flint Journal* constituted a constructive discharge.

**II**

Summary judgment should be granted if the admissible evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all facts and draw all reasonable inferences in favor of the nonmovant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

**III**

**A**

Contracts in Michigan are interpreted according to their plain meaning. "We enforce contracts according to their terms," the Michigan Supreme Court explains, "as a corollary of the parties' liberty of contracting. We examine written contractual language, and give the words their plain and ordinary meanings." *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) (internal citation omitted) (citing *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005)).

In this case, the handbook establishes that Defendant will employ Plaintiff as long as he performs "satisfactorily," providing:

> We provide job security to all full-time, salaried employees who are not covered by a collective bargaining agreement. This means that no full-time, salaried employee will lose his or her job because of new equipment, technological advances or lack of work. Once you have satisfactorily completed a probationary period, you will become a permanent employee. Then, this unique job security pledge applies to you as long as you continue to perform your assigned tasks satisfactorily, do not engage in misconduct and this newspaper continues to publish.

Def.'s Mot. Ex. B, at 5. The plain language of the handbook creates a satisfaction contract. *See, e.g.*, *Masck v. The Herald Co.*, No. 07-10511, 2007 WL 4454965, at *5 (E.D. Mich. Dec. 14, 2007) (holding The Herald Co. "job security pledge" creates satisfaction contract); *Shriner v. The Herald Co.*, No. 230346, 2003 WL 1447873, at *3 (Mich. Ct. App. Mar. 13, 2003) (same).

"A satisfaction employment contract is a contract in which an employer agrees to employ a person as long as the employer is satisfied with the person's job performance." *Mitchell v. Gen. Motors Acceptance Corp.*, 439 N.W.2d 261, 265 (Mich. Ct. App. 1989) (citing *Koehler v. Buhl*, 54 N.W. 157, 159 (Mich. 1893)). "The employer may discharge under a satisfaction contract as long as he is in good faith dissatisfied with the employee's performance." *Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W. 2d 880, 896 (Mich. 1980).

Significantly, "The employer is the sole judge of whether the person's job performance is satisfactory." *Meagher v. Wayne State Univ.*, 565 N.W.2d 401, 415 (Mich. Ct. App. 1997) (citing *Mitchell*, 439 N.W.2d at 265). More than a century ago, the Michigan Supreme Court observed: "It is settled law that, where a person contracts to do work to the satisfaction of his employer, the employer is the judge, and the question of the reasonableness of his judgment is not a question for the jury." *Koehler*, 54 N.W. at 159.

In this case, the undisputed evidence is that Defendant terminated Plaintiff because his supervisors were genuinely dissatisfied with his performance. Specifically, in December 2009, Ms. Raymer "recommended to Mr. Hiner and Matt Sharp (the *Flint Journal*'s publisher) that the *Flint Journal* should terminate Mr. Bohn because he was not satisfactorily performing his job duties." Raymer Aff. ¶ 11 (italics supplied). In Plaintiff's deposition he confirms that he was aware of his supervisors' dissatisfaction. Counsel asked Plaintiff:

> Q: You understood Ms. Raymer was not happy about [your performance]?
> A: She was never happy with me. . . .
> Q: Mr. Sharp told you that you weren't performing and you needed to improve, correct?
> A: I don't remember . . . .
> Q: But you understood based on your discussions with [Mr. Sharp] and Mr. Foren and with Ms. Raymer from June through November that you needed — that there were things that they believed you needed to improve on, correct?
> A: They kept telling me that, yes.
> Q: And told you what you needed to improve on, correct?
> A: They told me lots of things, yes.

Pl.'s Dep. 190:16–17, 194:10–12, 194:18–24. Defendant is entitled to summary judgment on Plaintiff's wrongful discharge claim.

Arguing against this conclusion, Plaintiff asserts that "satisfaction contracts have been [construed] by the courts as requiring that the dissatisfaction be both genuine and reasonable. Those determinations are fact questions to be decided by a jury." Pl.'s Resp. to Def.'s Mot. 15, ECF No. 28 ("Pl.'s Resp.").[1] He continues: "Whether the Defendant was truthfully dissatisfied with the Plaintiff's conduct, or had retaliated against him for refusing to accept the buyout, and actually had a target on his back as promised a question for a jury." *Id*.

---

[1] To the extent that Plaintiff is asserting that whether the dissatisfaction is genuine is always a jury question, the assertion has been expressly rejected by the Michigan Court of Appeals. *Shriner v. The Herald Co*., No. 230346, 2003 WL 1447873, at *3 (Mich. Ct. App. Mar. 13, 2003).

Plaintiff does not, however, introduce any evidence suggesting that Defendant is being disingenuous in asserting it that terminated Plaintiff because of genuine dissatisfaction with his performance.  He does not offer any evidence, for example, suggesting that Mr. Sharp and Ms. Raymer feigned dissatisfaction with Plaintiff's work to "build a file" on him.  He offers no evidence suggesting that his supervisors were actually satisfied with his work, but concealed this satisfaction in order to retaliate against Plaintiff for rejecting the buyout.  Rather, the undisputed evidence is that Defendant terminated Plaintiff because his supervisors were genuinely dissatisfied with Plaintiff's performance.  Defendant is entitled to judgment on Plaintiff's wrongful discharge claim.

**B**

Plaintiff next argues that Defendant is not entitled to summary judgment because transferring Plaintiff to the *Flint Journal* was a constructive discharge.  Thus, Plaintiff reasons, regardless of whether supervisors at the *Flint Journal* were genuinely dissatisfied with his performance, "Defendant's action of mandatorily deporting the Plaintiff to the *Flint Journal* constituted a constructive discharge."  Pl.'s Resp. 16 (formatting omitted and italics supplied).  Plaintiff's argument is unpersuasive.

"A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Manning v. City of Hazel Park*, 509 N.W.2d 874 (Mich. Ct. App. 1993); (citing *Hammond v. United of Oakland, Inc*., N.W.2d 652, 697 (Mich. Ct. App. 1992)).

"If the requisite elements of constructive discharge are demonstrated, the Court indulges in the legal fiction that the employee's voluntary resignation was, in actuality, involuntary

termination of the employee's employment by the employer." *Baker v. Baxa Corp.*, No. 09-cv-02034-MSK-KLM, 2011 WL 650002, at *1 (D. Colo. Feb. 11, 2011); *see Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 73 (D.D.C. 2006) (noting that in appropriate circumstances courts will "indulge a legal fiction, known as 'constructive discharge,' whereby a resignation is treated as an involuntary termination."); *see generally* Mark Kelly, *Constructive Discharge: A Suggested Standard for West Virginia and Other Jurisdictions*, 93 W. Va. L. Rev. 1047 (1991) ("Constructive discharge is a legal fiction that permits an employee's resignation to be treated as a firing when certain circumstances are present. . . . [C]onstructive discharge means a discharge implied by the courts. No express or actual discharge occurs; rather, the courts examine the circumstances surrounding the employee's decision to quit or resign."); *cf. Wolff v. Auto. Club of Mich.*, 486 N.W.2d 75, 80 (Mich. Ct. App. 1992) (finding constructive discharge although employee waited more than a month after demotion before resigning).

In this case, Plaintiff did not resign. He stayed on the job until Defendant terminated his employment. Plaintiff was not constructively discharged — he was actually discharged. As Plaintiff was in fact discharged, the legal fiction does not apply.

Moreover, "constructive discharge is not in itself a cause of action . . . . Rather, constructive discharge is a defense against the argument that no suit should lie in a specific case because the plaintiff left the job voluntarily." *Vagts v. Perry Drug Stores, Inc.*, 516 N.W.2d 102, 104 (Mich. Ct. App. 1994) (internal citations omitted) (citing *Wolff*, 486 N.W.2d at 79–80; *Hammond*, 483 N.W.2d at 654–55); *see generally* 9 Michigan Civil Jurisprudence *Employment Relationship* § 51 (West 2012).

In *Hammond*, for example, the plaintiff alleged that his manager "was agitated and brandishing a knife and told me that I had no choice but to sign the resignation document." 483 N.W.2d at 654–55. The plaintiff signed resignation document and then brought suit for wrongful discharge. The court of appeals noted that "[a]t trial, defendants may introduce the resignation document and the fact that plaintiff received severance pay as evidence that he was not constructively discharged but rather resigned voluntarily." *Id*. at 655. But, the court explained, the defendants were not entitled to summary judgment on the wrongful discharge claim. "Viewing these allegations in the light most favorable to plaintiff," the court wrote, "a juror could reasonably conclude that plaintiff was forced to resign." *Id*. That is, the plaintiff was constructively discharged.

In this case, as noted, Plaintiff did not resign. His constructive discharge claim does not provide a vehicle for relief.

## IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 17) is **GRANTED**.

It is further **ORDERED** that Defendant's motion for leave to file excess pages (ECF No. 31) is **DENIED AS MOOT**.

                                                   s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge

Dated: May 17, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 17, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS